UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 06 CV 1684

——————————————————— x

VINCENT FERRE, Derivatively on Behalf of
EVCI CAREER COLLEGES HOLDING
CORP.,

               Plaintiff,

   vs.

JOHN J. MCGRATH, RICHARD
GOLDENBERG, AROL I. BUNTZMAN,
ROYCE N. FLIPPIN, JR., PHILIP M.
GETTER, DONALD GRUNEWALD and
ELIE HOUSMAN,

               Defendants,

   -and-

EVCI CAREER COLLEGES HOLDING
CORP., a Delaware corporation,

               Nominal Defendant.

——————————————————— x

Civil Action No.

JURY TRIAL DEMANDED



RECEIVED
MAR 0 2 2006
U.S.D.C. S.D. N.Y.
CASHIERS

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF
CORPORATE ASSETS AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of EVCI Career Colleges Holding Corp. ("EVCI" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between April 14, 2003 and the present (the "Relevant Period") and that have caused substantial losses to EVCI and other damages, such as to its reputation and goodwill.

## SUMMARY OF THE ACTION

2.      EVCI provides on-campus career college education through its subsidiaries. These subsidiaries include Interboro Institute, Inc. ("Interboro"), Technical Career Institutes, Inc. ("TCI") and Pennsylvania School of Business, Inc. ("PSB"). EVCI purchased Interboro in 2000. Interboro is a two-year college that offers Associate degree programs.

3.      Interboro generates the majority of EVCI's revenue. Specifically, Interboro produced approximately 93% of EVCI's revenue during the first three quarters of FY:05. Defendants Arol I. Buntzman ("Buntzman"), John J. McGrath ("McGrath"), Richard Goldenberg ("Goldenberg"), and Donald Grunewald ("Grunewald") all held supervisory positions at Interboro during the Relevant Period, including Chancellor, Vice Chairman and Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and director, respectively. These defendants, due to their notable involvement at Interboro, had access to material adverse information concerning the various improper practices designed to maximize the amount of federal and state aid granted to students and increase enrollment.

4.      New York's Office of the State Comptroller ("OSC") is the State Auditor that conducts management and financial audits of State agencies and public benefit corporations, including Interboro. In 2005, the OSC audited Interboro's records and procedures used in administering the Higher Education Services Corporation ("HESC") government funded Tuition

- 1 -

Assistance Program ("TAP"). TAP is the largest student grant and scholarship program administered by HESC. TAP eligible students must meet specific enrollment and educational requirements.

5.      According to the OSC's audit results published on March 7, 2005, its audit objective was "to determine whether Interboro's management complied with the Law and the Commissioner of Education's Rules and Regulations [("Regulations")] for certifying students as eligible for TAP awards." Therefore, OSC monitored and reviewed Interboro's management internal control system. The audit covered the academic years of 2000-2001 and 2002-2003.

6.      The OSC audit results revealed that TAP had overpaid Interboro by $903,150. Interboro officials caused the overpayment by improperly certifying 17 students as eligible for 27 TAP awards. Moreover, the audit revealed that Interboro had improperly credited wrong answers as correct on federal exams, including the Career Programs Assessment test ("CPAt") and the Combined English Language Skills Assessment ("CELSA") test, utilized for aptitude educational requirements. Thus, students not qualified due to the educational requirement of high school graduation or its equivalent improperly received TAP loans.

7.      Additionally, the OSC audit revealed that Interboro improperly granted TAP awards to students who were not in good academic standing and/or attending school full-time. Under the Regulations, a student must meet a minimum grade point average ("GPA") and maintain a certain minimum number of credits.

8.      Interboro admitted that most of the OSC audit findings were accurate. Accordingly, OSC instructed Interboro to ensure that school officials comply with the Regulations and other applicable rules and regulations.

9.      The New York State Educational Department ("NYSED") is a state agency responsible for setting educational policy, standards and rules that is legally required to ensure entities meet the proper standards. Interboro is governed by the regulations of NYSED.

10.      Despite the OSC's demand made on Interboro to comply with Regulations and other applicable rules and regulations, on October 19, 2005, EVCI disclosed that it received a probationary draft report from NYSED regarding its subsidiary Interboro.  Specifically, *the NYSED draft report*

- 2 -

*revealed that Interboro was still not in compliance with the applicable rules and regulations governing degree-granting institutions.*

11.     NYSED's draft report revealed that Interboro was improperly admitting under-qualified students, offering sub-par education, and that most Interboro students were dropping out before receiving a degree. Additionally, the draft report indicated that some students did not even have the proper level of education to attend Interboro. As a result, the draft report recommended that EVCI immediately increase full-time faculty and improve infrastructure.

12.     Subsequently, on December 6, 2005, NYSED issued a final report that further revealed that Interboro was providing illegal testing procedures, admitting unqualified students and encouraging students to falsify income to increase awarded financial aid. The final report detailed multiple violations, including the following:

(a)     An Interboro employee recommended  falsifying income in order to qualify for financial aid to a state undercover agent posing as a student;

(b)     Interboro modified incorrect answers on federal exams to qualify students for federal and state aid;

(c)     A peer-review study by outside educators, commissioned by NYSED, concluded that Interboro's students were unprepared for college-level work and Interboro was not providing them with adequate academic support;

(d)     Of a  sample of 100 students who enrolled in fall 2001, only two finished in the 16-month period Interboro advertised was necessary to earn a degree; and

(e)     Undercover agents additionally disclosed certain answers were marked in the exam books and that during an exam a proctor left a testing room for an extended period.

13.     NYSED's final report revealed that the illegal admissions procedures uncovered in the March 2005 audit results remained uncorrected as of December 6, 2005. Because of defendants McGrath, Buntzman, Goldenberg and Grunewald's supervisory positions at both Interboro and EVCI, they had ample opportunity to correct Interboro's illegal and improper acts. The improper activities, however, were discovered by two regulatory bodies, but not by any Interboro or EVCI

- 3 -

officials. After such discovery, the Individual Defendants did not monitor or supervise Interboro's improper activities.

14.     Throughout the Relevant Period, defendants caused or allowed EVCI to employ improper business practices, as described below, that resulted in false and/or misleading information being filed with the United States Securities and Exchange Commission ("SEC") and released to the investing public and the Company's shareholders. This information was materially false and/or misleading because it failed to disclose the improper accounting utilized in assessing the Company's earnings and student enrollment growth. This improper accounting was a result of the following:

(a)     Interboro's violations of multiple state and federal applicable rules and regulations, including falsifying students' income to receive financial aid;

(b)     Interboro's misleading forecast of student enrollment; and

(c)     Usage of Interboro's inaccurate student enrollment figures and improperly granted student TAP awards to increase EVCI's income on its financial statements.

15.     The true facts which were known or should have been known by each of the defendants but concealed from the Company's shareholders and the investing public during the Relevant Period, were as follows:

(a)     That the Company lacked appropriate internal controls to prevent the improper practices that transpired during the Relevant Period;

(b)     That Interboro designed its admission quality controls in order to insure that approximately 99% of those who applied were, in fact, admitted;

(c)     That the Company allowed employees to instruct prospective students to lie on their financial aid forms to ensure the students would pay full tuition price;

(d)     That the level of education offered at Interboro was far below college-level standards;

(e)     That students received correct answers on federal exams to ensure that Interboro itself would qualify for its students to receive the very financial aid which inflated the Company's results;

- 4 -

(f)     Because of Interboro's improper and illegal admission practices, it was ordered by the State of New York to cease any expansion plans; and

(g)     As a result of the above improper activities, the Company's earnings, net income and projections of growth were materially false and misleading and EVCI has suffered millions of dollars worth of damage, including damage to its corporate image, goodwill and reputation, along with exposure to several class actions alleging state and federal securities violations, along with Interboro's exposure to state and federal sanctions.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

17.     This Court retains general jurisdiction over each named defendant who is a resident of New York. Additionally, this Court has specific jurisdiction over each named nonresident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. EVCI is a citizen of New York, and because the allegations contained herein are brought derivatively on behalf of EVCI, defendants' conduct was purposefully directed at New York. Defendants' conduct arose out of New York, where EVCI maintains its corporate headquarters. Finally, exercising jurisdiction over named nonresident defendants is reasonable.

18.     Venue is proper in the this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to EVCI occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

19.     Plaintiff Vincent Ferre ("Ferre") is, and was at times relevant hereto, an owner and holder of EVCI common stock. Ferre is a citizen of Minnesota.

20.     Nominal defendant EVCI is a corporation organized and existing under the laws of the state of Delaware, with its headquarters located at 1 Van Der Donck Street, 2nd Floor, Yonkers, New York. EVCI provides on-campus career college education through its subsidiaries. These subsidiaries include Interboro, TCI and PSB. Interboro is a two-year college that offers Associate degree programs. EVCI is a citizen of New York.

21.     Defendant McGrath is, and at all times relevant hereto was, President, CEO and a director of EVCI. McGrath is also CEO of Interboro and has been since January 2003. Additionally, McGrath has been Vice Chairman of Interboro since January 2000. Because of McGrath's positions, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for financial aid; manipulation of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' ("Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, McGrath participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. For FY:03 and FY:04, EVCI paid defendant McGrath $315,749 and $490,713, respectively, in salary, bonus and other compensation, and granted him 51,510 and 113,490 options to purchase EVCI stock, respectively. For FY:05, McGrath expects to receive an additional 240,000 options under EVCI's 2004 Incentive Stock Plan ("2004 Plan"). During the Relevant Period, McGrath sold 150,000 shares of EVCI stock for proceeds of $1,725,000. McGrath is a citizen of New York.

22.     Defendant Buntzman is, and at all times relevant hereto was, Chairman of the Board of EVCI. Buntzman is also Chancellor of Interboro and has been since January 2003. Additionally, Buntzman has been Chairman of the Board since Interboro was acquired by EVCI in 2000. From January 2000 to December 2002, Buntzman was Interboro's CEO. Because of Buntzman's position, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for financial aid; manipulation

- 6 -

of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Buntzman participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. For FY:03 and FY:04, EVCI paid defendant Buntzman $465,996 and $666,686, respectively, in salary, bonus and other compensation, and granted him 140,719 and 204,281 options to purchase EVCI stock, respectively. For FY:05, Buntzman expects to receive an additional 360,000 options under EVCI's 2004 Plan. During the Relevant Period, Buntzman sold 610,000 shares of EVCI stock for proceeds of $4,765,000. Buntzman is a citizen of New York.

23.     Defendant Goldenberg is, and at all times relevant hereto was, a director of EVCI. Goldenberg was CFO of EVCI at all relevant times hereto, until September 2005. Additionally, Goldenberg is, and at all times relevant hereto was, CFO of Interboro. Because of Goldenberg's position, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for financial aid; manipulation of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Goldenberg participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03 and FY:04, EVCI paid defendant Goldenberg $200,546 and $195,053, respectively, in salary, bonus and other compensation, and granted him 19,604 and 45,396 options to purchase EVCI stock, respectively. During the Relevant Period, Goldenberg sold 40,000 shares of EVCI stock for proceeds of $460,000. Goldenberg is a citizen of New York.

- 7 -

24.     Defendant Phillip M. Getter ("Getter") is, and at all times relevant hereto was, a director of EVCI. Because of Getter's position, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for financial aid; manipulation of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Getter participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. During the Relevant Period, Getter sold 7,250 shares of EVCI stock for proceeds of $95,486. Getter is a citizen of New York.

25.     Defendant Royce N. Flippin, Jr. ("Flippin") is, and at all times relevant hereto was, a director of EVCI. Because of Flippin's position, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for financial aid; manipulation of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Flippin participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. During the Relevant Period, Flippin sold 21,687 shares of EVCI stock for proceeds of $205,500.75. Flippin is a citizen of New Jersey.

26.     Defendant Grunewald is, and at all times relevant hereto was, a director of EVCI. Additionally, Grunewald is, and all times relevant hereto was, a director of Interboro. Because of Grunewald's position, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for

- 8 -

financial aid; manipulation of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Grunewald participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Grunewald is a citizen of Connecticut.

27.     Defendant Elie Housman ("Housman") is, and at all times relevant hereto was, a director of EVCI. Because of Housman's position, he knew the adverse, non-public information about the business of EVCI and Interboro, including the following improper activities: overstatement of income to qualify for financial aid; manipulation of admissions and improper testing procedures; and manipulation of the Company's finances, its position in the financial markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Housman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Housman is a citizen of New York.

28.     The defendants identified in ¶¶21-27 are referred to herein as the "Director Defendants." The defendants identified in ¶¶21, 23 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶21-25 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors and/or fiduciaries of EVCI and because of their ability to control the business and corporate affairs of EVCI, the Individual Defendants owed EVCI and its shareholders fiduciary obligations of trust, loyalty, good faith and

due care, and were and are required to use their utmost ability to control and manage EVCI in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of EVCI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to EVCI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of EVCI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with EVCI and Interboro, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of EVCI.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of EVCI, and was at all times acting within the course and scope of such agency.

33.     To discharge their duties, the officers and directors of EVCI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of EVCI were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves including refraining from selling shares while in possession of material, non-public information;

- 10 -

(b)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)      remain informed as to how EVCI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

34.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of EVCI, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of EVCI's Board during the Relevant Period.

35.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, EVCI has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     the cost to obtain additional funds through borrowing which is now higher because EVCI's stock price has declined;

(c)     additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums;

(d)     costs incurred from directing manpower to correct both Interboro's and EVCI's defective internal controls; and

(e)     costs incurred in investigating and defending EVCI and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

36.     Moreover, these actions have irreparably damaged EVCI's corporate image and goodwill.  For at least the foreseeable future, EVCI will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that EVCI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

- 12 -

38.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at EVCI and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of EVCI, regarding the Individual Defendants' management of EVCI's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

39.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least April 2003 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that EVCI was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about EVCI's financial performance and future business prospects, as alleged herein.

40.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of EVCI common stock so they could: (i) dispose of over $7 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

41.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority

- 13 -

of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

43.     Interboro is a two-year college that offers Associate degree programs. In 1996, prior to EVCI's purchase of Interboro, the OSC recovered over \$4 million in TAP awards from Interboro. The 1996 OSC audit declared students were incorrectly certified as eligible for TAP awards due to academic standing, educational requirements and matriculation. Four years later, EVCI purchased Interboro in 2000 with the knowledge of the OSC 1996 audit.

44.     Interboro generates the majority of EVCI's revenue. Specifically, Interboro produced approximately 93% of EVCI's revenue during the first three quarters of FY:05. Defendants Buntzman, McGrath, Goldenberg and Grunewald all held supervisory positions at Interboro during the Relevant Period, including Chancellor, Vice Chairman and CEO, CFO and director, respectively. These defendants, due to their notable involvement at Interboro, had access to material adverse information concerning the various improper practices designed to maximize the amount of federal and state aid granted to students and increase enrollment.

45.     In 2005, the OSC again audited Interboro's records and procedures used in administering the government funded TAP. TAP is the largest student grant and scholarship programs administered by HESC. TAP eligible students must meet specific enrollment and educational requirements.

46.     According to the OSC's 2005 audit report, published on March 7, 2005, its audit objective was "to determine whether Interboro's management complied with the [Regulations] for certifying eligible for TAP awards." Therefore, OSC reviewed Interboro's management internal control system. The audit covered the academic years of 2000-2001 and 2002-2003.

47.     The conclusions the OSC reached in 2005 were very similar to the results of the 1996 OSC audit. The 2005 OSC audit revealed that TAP had overpaid Interboro by $903,150. School Officials caused the overpayment by improperly certifying 17 students as eligible for 27 TAP awards. Moreover, the audit revealed that Interboro had improperly credited wrong answers as correct on federal exams, including the CPAt and the CELSA test, utilized for aptitude educational requirements. Thus, students at Interboro who did not possess the educational requirement of high school graduation or its equivalent improperly received TAP loans.

48.     Additionally, the 2005 OSC audit revealed that Interboro improperly granted TAP awards to students not in good academic standing or attending school full-time. Under the Regulations a student must meet a minimum GPA and maintain a certain minimum number of credits.

49.     Interboro admitted that most of the 2005 audit findings were accurate. Accordingly, OSC instructed Interboro to ensure that school officials comply with the Regulations and applicable rules and regulations.

50.     Despite the OSC's demand made on Interboro to comply with the Regulations and other applicable rules and regulations, on October 19, 2005, EVCI disclosed that it received a probationary draft report from NYSED regarding its subsidiary Interboro. Specifically, *the NYSED draft report revealed that Interboro was still not in compliance with the applicable rules and regulations governing degree-granting institutions*.

51.     NYSED's draft report revealed that Interboro was improperly admitting under-qualified students and offering sub-par education, most Interboro students were dropping out before receiving a degree. Additionally, some students did not even have the proper level of education to attend Interboro. Therefore, the draft report recommended that EVCI immediately increase full-time faculty and improve infrastructure.

52.     Subsequently, on December 6, 2005, NYSED issued a final report that revealed that Interboro was providing illegal testing procedures, admitting unqualified students and encouraging students to falsify income to increase awarded financial aid.

- 15 -

53.     NYSED's final report revealed that the illegal admissions procedures uncovered in the March 2005 audit results remained uncorrected as of December 6, 2005. Because of defendants McGrath, Buntzman, Goldenberg and Grunewald supervisory positions at both Interboro and EVCI, they had ample opportunity to correct Interboro's illegal and improper acts. However, the improper activity was discovered by two regulatory bodies, but not by any Interboro or EVCI officials. After such discovery, the Individual Defendants did not monitor or supervise Interboro's improper activities.

## IMPROPER STATEMENTS

54.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to EVCI a duty to insure that the Company's public statements fairly presented, in all material respects, Interboro's student enrollment growth, which is the most important aspect of EVCI's business, as well as all other issues material to the Company's operations. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements. Defendants McGrath, Goldenberg, Buntzman and Grunewald, with their supervisory positions at Interboro, had specific knowledge of Interboro's non-compliance with regulated admissions procedures. Furthermore, defendants Getter, Flippin and Housman as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for "review[ing] earnings press releases, as well as EVCI's policies with respect to earnings press releases, financial information and earnings guidance provided to analysts and rating agencies...." Defendants McGrath, Goldenberg and Buntzman, as officers of EVCI, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Buntzman, McGrath, Goldenberg, Flippin, Getter, Grunewald and Housman, as directors of EVCI, had ample opportunity to discuss this material information with management and fellow directors at any of the 14 Board meetings that occurred between FY:03 and FY:04 during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly,

and/or intentionally caused or allowed, by their actions or inactions, the following improper

statements to be disseminated by EVCI to the investing public and the Company's shareholders

during the Relevant Period.

55.     On August 14, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "EVCI Career Colleges Incorporated Reports Record Six Month

Results." The press release reported, in pertinent part:

> EVCI Career Colleges Incorporated, owner of Interboro Institute, reported a $2.7
> million increase in total revenue and a positive swing of approximately $1.0 million
> in net income available to common stockholders for the six months ended June 30,
> 2003 as compared to the same period of 2002. New student enrollments, increased
> retention and the addition of new college sites were primarily responsible for this
> increase.

* * *

> Dr. John J. McGrath, EVCI's CEO and President, noted that revenue varies by
> academic semester. *'Like most colleges, our wholly owned subsidiary, Interboro
> Institute, Inc., has greater enrollment for each of the fall and spring semesters
> than the summer semester. Total student enrollment and net revenue are generally
> highest in the fourth and first quarters.'*

56.     On November 14, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Career Colleges Announces Record Third Quarter Results." The pres

release reported, in pertinent part:

> EVCI Career Colleges Incorporated today reported record third quarter revenues and
> income from continuing operations. Net revenue for the quarter ended September 30,
> 2003 was $4,321,000, a 40% increase over revenue of $3,081,000 for the quarter
> ended September 30, 2002

* * *

> *Our improved results were primarily driven by increased college enrollments. As
> EVCI reported on October 22nd, enrollments for the fall semester are up over 30%
> to approximately 2,300 full-time students from 1,750 full-time students last fall.
> Enrollment growth was entirely organic.* EVCI did not make any acquisitions and
> Interboro did not open new college sites during the previous 12 months.

* * *

> *Subsequent to the end of the quarter, Interboro obtained a bank line of credit of
> $1.5 million to finance any deferrals of the New York State Tuition Assistance
> Program grants.* Interboro Institute also borrowed $1 million in August from a bank
> at 6% interest, repayable in three years in equal monthly installments of interest and
> principal, with principal repayments to begin in October 2003. Additionally, as
> previously disclosed in August 2003, EVCI raised $2 million by selling common
> stock and warrants.

Dr. McGrath noted that recent events enable management to devote more time and resources to EVCI's basic business of post-secondary education. *In addition, Dr. McGrath believes that 'the market is now better able to focus on our fundamentals and, in turn, EVCI's longer term business prospects. Our long-term goal of increasing the intrinsic value per share of EVCI has been advanced by the recent interest in the company by institutional and other investors.'*

57.     On January 6, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled " EVCI named by Journal News: 'Biggest Gainer' in the '2003 Journal

News' Bloomberg Index." The press release reported:

The Journal News reported on January 1, *2004 that EVCI Career Colleges Incorporated led the Journal News' Bloomberg Index for 2003 because EVCI shares rose 729 percent, closing out the year at $5.39.* This local index tracks 77 stocks with corporate headquarters or a major presence in Westchester, Rockland, and Putnam counties in New York State.

According to the Journal News, EVCI's gains greatly outstripped the local index's average gain of 27.9 percent, as well as annual gains of 25.3 percent for the Dow Jones industrial average, 26.4% for the S&P 500, and 50% for the Nasdaq Stock Market.

*The newspaper reported that investors responded favorably to EVCI's ownership of college sites that had substantial increases in enrollments and revenues.*

Dr. John J. McGrath, CEO and President of EVCI, expressed his pleasure at EVCI's recognition. 'We are gratified that shareholder value has increased dramatically over the past year and that the success of our business strategy is being recognized by the investing public.'

Dr. Arol I. Buntzman, Chairman of EVCI, believes that EVCI's present stock price still does not reflect EVCI's fundamental value, particularly when compared to other companies in the post-secondary industry. He stated, *'we are optimistic that the market will continue to see how favorable EVCI's ratios are when compared to others in the post-secondary industry.'*

*The forward looking statement in this press release regarding management's optimism about the market's recognition of EVCI's ratios reflect management's current views with respect for future events and are subject to certain assumptions, rules, and uncertainties. These include: EVCI may not continue to grow internally, through Interboro, and may not be able to identify and conclude acquisitions of other schools; problems with regulators could adversely affect existing Interboro sites; competition for students could intensify substantially; and the other specific risk factors described in EVCI's filing with the SEC, including its most recent form 10-QSB and Form S-3.* Should one or more of these risks prove incorrect, actual results may vary materially from those anticipated by any forward-looking statement. EVCI undertakes no obligation to update the information in this press release.

58.     On February 23, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "EVCI Career Colleges Reports Record Results for 2003 Fourth

Quarter and Year-End," The press release reported, in pertinent part:

> EVCI Career Colleges Incorporated today reported unaudited preliminary financial results for the fourth quarter and year ended December 31, 2003.
>
> Fourth quarter 2003 revenues were $5.8 million, up 15% from $5.0 million last year. Fourth quarter net income available to common stockholders was $2.2 million, or basic earnings per share of $0.20 and diluted earnings per share of $0.19. This represents a swing of $2.6 million from last year's fourth quarter net loss of $0.4 million.
>
> Dr. John J. McGrath, CEO and President, commented that 2003 was, by far, the best year ever and produced EVCI's first full year of net income. *'Our operating results were outstanding and we substantially improved our balance sheet. We exceeded our goals.'*

59.     On March 30, 2004, the Individual Defendants caused or allowed the Company to

make a third secondary offering. The offering successfully raised $10 million. This offering, like

the two before it, would later expose the Company to massive liability for violations of federal

securities laws. The Individual Defendants caused or allowed the Company to issue a press release

entitled "EVCI Receives $10,000,000 in an Equity Private Placement." The press release reported,

in pertinent part:

> EVCI Career Colleges Incorporated announced it has sold 1,038,962 shares of its common stock for $10,000,000 to institutional investors.
>
> *The net proceeds can be used for working capital and general corporate purposes, including expanding Interboro Institute, enhancing the college's facilities and further improving its retention and graduation rates.*
>
> EVCI has agreed to register the shares, including the shares underlying the warrants, for resale under the Securities Act of 1933 and applicable state laws. Until so registered, or exempt from registration, none of the securities may be sold in the United States.

60.     On April 2, 2004, the Individual Defendants caused or allowed the Company to issue

the press release entitled "EVCI Career Colleges Reaffirms EPS Guidance After Stock Sales." The

press release reported, in pertinent part:

> EVCI Career Colleges Incorporated *announced today that in order to accommodate institutional demand, its Chairman, Dr. Arol I. Buntzman, Chief Executive Officer and President, Dr. John J. McGrath, and Chief Financial Officer, Richard Goldenberg, today sold a total of 500,000 restricted shares of EVCI's common stock to institutional buyers at $11.50 per share*. EVCI previously sold 1,038,962 restricted common shares on March 30, 2004 to other institutional buyers that included two existing shareholders. *Dr. McGrath said, 'Institutional demand was*

- 19 -

*extremely high, but EVCI was not willing to incur additional dilution to its existing shareholders at this time. We made the decision, with regard to each of our personal situations, to meet this demand with a portion of our personal holdings. Management continues to hold significant stakes in EVCI's equity, representing our belief in the future prospects for EVCI and its business.'*

Management believes that EVCI will achieve earnings of $0.50 per share for 2004, notwithstanding the increase to 12,002,241 outstanding shares as a result of the $10,000,000 received from the other institutional buyers.

61.     On May 11, 2004, the Individual Defendants caused or allowed the Company to issue

a press release entitled "EVCI Career Colleges Posts Record Results for First Quarter 2004." The

press release reported, in pertinent part:

EVCI Career Colleges Incorporated today announced results and filing of its 10-QSB for the first quarter of 2004. *On a revenue increase of 41% over the first quarter 2003, EVCI increased income from operations by 82% and net income by 83%. Income available to common stockholders increased by 143%.* As a percentage of revenue, income available to common stockholders grew to 25% as compared to 14% for the first quarter last year

*   *   *

Dr. John J. McGrath, Chief Executive Officer and President, noted that, 'the first quarter differential between the percentage increase in students and the percentage *increase in revenue is due principally to the late completion of construction (on March 1, 2004) at Interboro's new Yonkers facility, and an increase in financial assistance to existing students in good academic standing.* Accordingly, we will recognize $2.3 million of deferred revenue in the second quarter 2004, up 142% over the deferred revenue for the second quarter 2003. The first quarter 2004 deferred revenue will be fully recognized upon completion of the spring semester in the second quarter. Interboro's revenue is recognized ratably over each of its three academic semesters, all of which will be completed at each college site during 2004.'

*   *   *

*'Our recently completed $10.0 million equity financing, together with funds internally generated in the first quarter, has significantly strengthened our balance sheet,'* Dr. McGrath added. 'Our current assets increased to $19.0 million from $5.4 million on December 31, 2003. Our working capital ratio increased to 3.1:1 from 1.6:1. Our stronger balance sheet enables EVCI to continue to aggressively pursue our plans to expand Interboro this year by adding four new annexes to the existing college sites and to develop a new freshman admissions center.'

62.     On August 26, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "EVCI Provides Operating Income Guidance for Fiscal Year 2004."

The press release reported, in pertinent part:

EVCI Career Colleges Holding Corp. estimates its income from operations for 2004 will be between approximately $4,500,000 and $5,000,000. This equates to between $0.35 and $0.39 of operating income per share based on an estimate of EVCI's diluted weighted average number of outstanding shares for 2004. This compares to an estimate of operating income per share of $0.38 that was previously used in

- 20 -

computing EVCI's guidance of fully diluted EPS of $0.50 for 2004. The $0.12 difference between $0.50 and $0.38 is the result obtained after deducting estimated interest expense and adding the estimated net income tax benefit to EVCI from the utilization of its NIL. Using a range for the current estimate of income from operations reflects management's desire to be more conservative in providing guidance.

Dr. John J. McGrath, EVCI's Chief Executive Officer and President, commented: *'After research and analysis, EVCI's auditors have advised that, any disallowances resulting from the ongoing routine TAP audit of Interboro's three academic years ended June 30, 2003 should be reflected as a separate expense line item following its operating income for the year in which the final audit results can reasonably be estimated. Accordingly, management is replacing previously issued EPS guidance with income from operations guidance for 2004 because we cannot provide guidance regarding the potential amount of TAP disallowances. The final results of the TAP audit cannot be reasonably estimated.* Furthermore, the New York State Comptroller's procedures prohibit colleges and universities from making any public disclosure of their audit results until the audit is final. Management believes the TAP audit will be completed in 2004. Given the cur-rent climate for public companies that own for profit colleges, I would like to assure the public that management is very confident that any TAP disallowance will not in any way result from intentional misconduct.'

Richard Goldenberg, EVCI's Chief Financial Officer concluded: 'If we are successful in our claim that 50% of any TAP disallowances relating to calendar years 2001-2003 results in a reduction of the purchase price payable for Interboro to the former owner, the amount of this reduction would be reflected on our balance sheet as a decrease in accrued purchase price payable for Interboro and a corresponding decrease in goodwill. However, this reduction would not reduce the total amount of disallowances included as a separate expense line item on our statement of operations.'

63.    On November 15, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "EVCI Career Colleges Holding Corp. Releases Results for Third

Quarter." The press release reported, in pertinent part:

EVCI Career Colleges Holding Corp. today announced results for the third quarter of 2004 and the filing of its 10-QSB.

Comparing the third quarters of 2004 and 2003, total revenue was $6.5 million versus $4.5 million, loss from operations was ($1.3 million) versus income from operations of $0.1 million and loss available to common stockholders was ($1.2 million) versus ($0.2 million). Fully diluted loss per share for the third quarter of 2004 was ($0.10) versus ($0.03) for the third quarter last year.

Comparing the first nine months of 2004 and 2003, total revenue was $20.8 million versus $14.4 million, income from operations was $0.5 million versus $1.4 million and income available to common stockholders was $0.3 million versus $0.4 million. Fully diluted income per share for the first nine months of 2004 was $0.03 as compared to $0.06 for the first nine months of 2003.

Dr. John McGrath, Chief Executive Officer and President commented: 'Our third quarter 2004 loss is consistent with our expectations. *While we had a 70% in-crease in enrollments, representing an additional 1600 students for the fall 2004 semester as compared to fall 2003, there were nine fewer days of revenue*

- 21 -

*recognition in the 2004 third quarter. This year's third quarter recognized only 14 days of revenue because the 2004 fall semester started a week later than originally scheduled.* We recognized 23 days of revenue in last year's third quarter because the fall 2003 semester started a week earlier than typical in our academic calendar. Congestion from the Republican National Convention caused a one week delay in the start of classes this semester. This delay represents five days of additional deferred revenue, or $1.1 million, which will be recognized in the fourth quarter 2004.'

64.    On March 7, 2005, the OSC released audit results for academic years 2000-2001 and

2002-2003 on Interboro. The audit disclosed that Interboro was overpaid $903,150 in TAP money

due to school officials incorrectly certifying 17 students as eligible for 27 TAP awards. Further, the

audit revealed that federal exams corrected by Interboro credited wrong answers as correct. Thus,

students were awarded TAP loans that were not qualified due to matriculation. Additionally, the

audit disclosed that students who were not in good academic standing or full time students were

granted TAP awards improperly by Interboro.

65.    On March 23, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Career Colleges Files 10-KSB." The press release reported EVCI's

financial results for FY:04 and stated, in pertinent part:

EVCI Career Colleges Holding Corp. filed its 10-KSB today and confirmed its previously announced operating results for 2004. The highlights include revenues of $33.1 million, up 64% from $20.2 million for 2003; income from operations of $4.6 million for 2004 as compared to $1.6 million for 2003, a 188% increase; and net income available to common stockholders of $6.3 million as compared to $2.6 million last year, a 142% increase. Net income included a benefit from income taxes of $2.8 million as compared to $1.9 million in 2003.

66.    On May 12, 2005, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Career Colleges Posts Results for First Quarter." The press release reported,

in pertinent part:

EVCI Career Colleges Holding Corp. today announced results and filing of its 10-Q for the first quarter of 2005.

Comparing the first quarters of 2005 and 2004, total revenue was $10.2 million versus $8.5 million, income from operations was $0.9 million versus $2.5 million, net income was $0.7 million versus $2.1 million. Diluted earnings per share was $0.05 for the first quarter of 2005, compared to $0.18 for the first quarter last year. Full-time enrollment was approximately 3,700 in the first quarter of 2005 compared to approximately 2,800 in the 2004 period, a 32% quarter-over-quarter increase.

Dr. John J. McGrath, CEO and President, commented: 'Because the spring 2005 semester began January 24, 2005, Interboro only had 49 days of revenue recognition in the first quarter of 2005. In contrast, the spring, 2004 semester started January 12, 2004, and Interboro had 58 days of revenue recognition in the first

quarter of 2004, except with respect to Interboro's Yonkers site, which had only 16 days of revenue recognition. The nine day difference between 49 and 58 days of revenue recognition represents $2 million of our total deferred revenue of $4.4 million at March 31, 2005. All of this deferred revenue will be recorded as revenue in the second quarter of 2005.'

Dr. McGrath continued: *'Our 2005 first quarter net income and earnings per share were also negatively impacted by costs, without any offsetting revenue, relating to the relocation of the campus of the Pennsylvania School of Business and regulatory compliance requirements relating to EVCI's acquisition of PSB in January 2005. We are very pleased to report that we now expect that PSB will be fully operational in time for the fall 2005 semester.'*

If we had been able to recognize the additional nine days of revenue, and did not have the PSB costs, we would have had net income of $2.3 million and diluted earnings per share of $0.18.

67.     On August 12, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "EVCI Career Colleges Releases Results for Second Quarter." The

press release reported, in pertinent part:

EVCI Career Colleges Holding Corp. today announced results and filing of its 10-Q for the second quarter of 2005.

Comparing the second quarters of 2005 and 2004, total revenue was $9.7 million versus $5.8 million, income from operations was $0.5 million versus a loss of $0.6 million and net income was $0.3 million versus a loss of $0.6 million. Diluted earnings per share was $0.03 for the second quarter of 2005, compared to a loss of $0.05 for the first quarter last year.

Comparing the first six months of 2005 and 2004, total revenue was $19.9 million versus $14.3 million, income from operations was $1.4 million versus $1.9 million and net income was $1.0 million versus $1.5 million.

Dr. John J. McGrath, CEO and President, commented: 'Our net income for the second quarter 2005 increased by $0.9 million from the second quarter 2004 loss because we had a 66% increase in revenue and a decrease in our operating expenses, as a percentage of our revenue, from 111% to 95%. Our second quarter revenue includes $2.0 million that was deferred from the first quarter due to the later start of our spring semester as compared to last years spring semester start date. However, our results for the second quarter and six months of 2005 reflect four less days of revenue recognition, or $522,000 attributable to the summer semester, as compared to the second quarter and six months of 2004.'

Dr. McGrath continued: 'Our 2005 quarterly and six months net income and earnings per share were also negatively impacted by costs of approximately $145,000 for the second quarter and approximately $278,000 for the six months, without any offsetting revenue, relating to the relocation of the campus of the Pennsylvania School of Business.'

If we had been able to recognize the additional four days of revenue, and did not have the PSB costs, we would have had adjusted net income of $1.6 million and adjusted diluted earnings per common share of $0.12.

## THE TRUTH IS REVEALED

68.    On October 19, 2005, the Individual Defendants caused or allowed EVCI to disclose

that it received a draft report from NYSED regarding its subsidiary Interboro in a press release

entitled "EVCI Career Colleges Receives Draft Report of Compliance Review of Interboro

Institute". Specifically, *the NYSED was interested in whether or not Interboro was in compliance*

*with the applicable rules and regulations governing degree-granting institutions*. The report

exposed the Company's overstated income based on the sub-par product (education) it provided,

which the Individual Defendants were aware of. Additionally, the draft report revealed the

Company's illegal admission practices. *Most students either dropped out before receiving a degree*

*or did not have the proper level of education to attend Interboro*. Therefore, it was recommended

that EVCI increase full-time faculty and improve infrastructure. Just prior to the report, EVCI filed

an application for approval to utilize its Yonkers site as an extension center to support its expanding

enrollment. However, the *NYSED denied the extension center* status for Yonkers in this report. In

the press release defendant McGrath commented on the draft report:

> Interboro is working diligently on its responses to the Department, which are due
> November 7, 2005. Interboro's assessment thus far leads it to believe that it will
> accept many of the recommendations for change made by the Department because
> they will strengthen Interboro and, accordingly, will be in the best interests of
> Interboro's students. *Some of the changes will slow Interboro's rate of enrollment*
> *growth and have an adverse impact on its margins. However, it will take time*
> *before we can properly assess the magnitude of the effect of these changes*.

69.    As a result of the October 19, 2005 announcement, the Company's stock price fell

$3.08, or 56%, to close at $2.45.

70.    On November 15, 2005, *Reuters* released an article entitled "EVCI Career Colleges

delays filing Q3 results," which stated, in relevant part:

> EVCI Career Colleges Holding Corp. said on Tuesday it will delay filing its third
> quarter results pending an investigation into alleged irregularities at the company's
> Interboro Institute.
>
> The company would await and evaluate the decision of the previously announced
> independent investigation being conducted by the audit committee of EVCI's board
> of directors, it said in a statement.
>
> *The New York State Education Department alleged certain irregularities in the*
> *admissions process at the Interboro Institute on Oct. 19*.
>
> *The company also withdrew its previously issued outlook for 2005*.

- 24 -

However, it declared unaudited preliminary results for the latest third quarter saying it lost 12 cents per diluted share compared with a loss of 10 cents in the year ago quarter.

71.     On November 22, 2005, *Market Wire* published an article entitled "EVCI Career Colleges Announces Results of Independent Investigation; 10-Q Has Not Yet Been Filed Because Auditors Have Not Finished Their Review," which stated, in relevant part:

> On October 19, 2005, EVCI announced that it had received a draft report of a compliance review of Interboro Institute undertaken by the New York State Education Department. The report included assertions of irregularities in Interboro's admissions practices.
>
> ***The allegations related primarily to the changing of test scores by a tester at Interboro's Yonkers site and a tester at Interboro's Flushing extension center and to a financial aid representative at Yonkers telling a student applicant to misrepresent his income so he would be eligible for financial aid.***
>
> Ritzert & Leyton, P.C., a firm with substantial experience in conducting internal investigations of proprietary schools, was retained by the audit committee of EVCI's board of directors to lead an extensive internal investigation. A report of the results of the investigation was submitted yesterday to the New York State Education Department. Interboro's response to the remainder of the draft report was submitted to the New York State Education Department by the deadline of November 7, 2005.
>
> *       *       *
>
> ***EVCI will file its 10-Q for the quarter and nine months ended September 30, 2005 when its independent auditors complete their review. EVCI cannot predict when the auditors' review will be completed.***

72.     On December 6, 2005, the NYSED issued a final report that detailed the findings of its investigation, including two site visits on March 30-31 and May 23-25, 2005. The report maintained that during NYSED's investigation, an Interboro employee proposed falsifying income to a state undercover agent in order to qualify for financial aid. Furthermore, Interboro altered incorrect answers on federal exams to qualify students for federal and state aid. A peer-review study by outside educators, commissioned by NYSED, concluded that Interboro's students were unprepared for college-level work and Interboro was not providing them with adequate academic support. Many dropped out without completing one semester, whereas, the continuing students had a grade average of D or slightly above. The report said that in a sample of 100 students who enrolled in fall 2001, only two finished in the 16-month period Interboro advertised was necessary to earn a degree. Undercover agents additionally disclosed certain answers were marked in the exam books and that during an exam a proctor left a testing room for an extended period.

- 25 -

73.     The final NYSED report denied the application for the Yonker's extension center due to the above findings. However, the report did require Interboro to downsize its student enrollment at all locations in accordance with a mandated proposal. This proposal required incorporation of new admissions procedures, stronger student retention and improved graduation rates and was to be submitted by January 4, 2006 to NYSED.

74.     As a result of the December 6, 2005 announcement, including the revelations above, the Company's stock plummeted another 30% to close at $1.80 per share.

## REASONS THE STATEMENTS WERE IMPROPER

75.     The statements referenced above were improper because they failed to disclose and/or misrepresented the following adverse facts, which were then known or should have been known by the Individual Defendants: (i) that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; (ii) that Interboro was in violation of many NYSED regulations, including the admissions and test procedures; (iii) that Interboro's level of education provided to students was far below college-level standards; (iv) that Interboro's improper admissions procedures ensured that students received financial aid, which inflated EVCI's results; (v) that EVCI was materially overstating Interboro's student enrollment growth  because of  Interboro's improper activities of improper admissions procedures, misleading student retention statistics and illegal exam procedures; and (vi) that as a result of the foregoing, the values of the Company's revenues and net income were materially overstated at all relevant times.

## ILLEGAL INSIDER SELLING

76.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of EVCI stock:

| Defendant | Transaction Date(s) | Shares | Price | Value |
|---|---|---|---|---|
| FLIPPIN | 11/17/2004 | 1,520 | $8.35 | $12,692.00 |
|  | 06/04/2004 | 5,000 | $11.26 | $56,300.00 |
|  | 06/04/2004 | 9,167 | $11.25 | $103,128.75 |
|  | 11/18/2003 | 2,000 | $5.25 | $10,500.00 |
|  | 01/12/2004 | 4,000 | $5.72 | $22,880.00 |
|  |  | 21,687 |  | $205,500.75 |
| GETTER | 04/19/2004 | 3,750 | $12.60 | $47,250.00 |
|  | 04/05/2004 | 2,000 | $13.79 | $27,580.00 |
|  | 04/05/2004 | 1,400 | $13.77 | $19,278.00 |

| | 04/05/2004 | 100 | $13.78 | $1,378.00 |
| | | **7,250** | | **$95,486.00** |
| MCGRATH | 04/02/2004 | 150,000 | $11.50 | $1,725,000.00 |
| | | **150,000** | | **$1,725,000.00** |
| BUNTZMAN | 04/02/2004 | 310,000 | $11.50 | $3,565,000.00 |
| | 11/12/2003 | 300,000 | $4.00 | $1,200,000.00 |
| | | **610,000** | | **$4,765,000.00** |
| GOLDENBERG | 04/02/2004 | 40,000 | $11.50 | $460,000.00 |
| | | **40,000** | | **$460,000.00** |
| **Total** | | **828,937** | | **$7,250,986.75** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.     Plaintiff brings this action derivatively in the right and for the benefit of EVCI to redress injuries suffered, and to be suffered, by EVCI as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. EVCI is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.     Plaintiff will adequately and fairly represent the interests of EVCI in enforcing and prosecuting its rights.

79.     Plaintiff is and was an owner of the stock of EVCI during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

80.     The current Board of EVCI consists of the following seven individuals: defendants Buntzman, McGrath, Goldenberg, Flippin, Getter, Grunewald and Housman. Plaintiff has not made any demand on the present Board of EVCI to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     Defendants McGrath, Buntzman, Goldenberg and Grunewald all hold various positions on Interboro's governing board. During the above four defendants' terms at Interboro, its records and procedures used in administering the TAP were audited by OSC. On March 7, 2005, the audit results declared Interboro was overpaid $903,150 because school officials incorrectly certified

17 students as eligible for 27 TAP awards. The audit revealed that Interboro had improperly credited wrong answers as correct on the federal exams utilized for aptitude educational requirements. Thus, students not qualified due to the educational requirement of high school graduation or its equivalent improperly received TAP loans. Further, the audit disclosed that Interboro improperly granted TAP awards to students who were not in good academic standing or full time students. Interboro admitted that the audit findings were accurate and OSC instructed Interboro to comply with the State Education Department requirements. The audit covered the academic years of 2000-2001 and 2002-2003. Despite the OSC's demand, on October 19, 2005, EVCI disclosed that it received a probationary draft report from a second state agency, NYSED, regarding Interboro. Specifically, the NYSED draft report revealed that Interboro was still not in compliance with the applicable rules and regulations governing degree-granting institutions. NYSED's draft report revealed that Interboro was improperly admitting under-qualified students, offering sub-par education, and that most Interboro students were dropping out before receiving a degree. Additionally, some students did not even have the proper level of education to attend Interboro. Therefore, the draft report recommended that EVCI immediately increase full-time faculty and improve infrastructure. Subsequently, on December 6, 2005, NYSED issued a final report that revealed that Interboro was providing illegal testing procedures, admitting unqualified students and encouraging students to falsify income to increase awarded financial aid. NYSED's final report revealed that the illegal admissions procedures uncovered in the March 2005 audit results remained uncorrected as of December 6, 2005. These improper activities were discovered by two regulatory bodies, yet the Board failed to take any action to correct the improprieties. Defendants McGrath, Buntzman, Goldenberg and Grunewald, who each had positions at Interboro, failed to monitor or correct these activities before or after such discovery. The above defendants ignored the significance and magnitude of Interboro's improper activities and the numerous red flags that occurred during the Relevant Period. Thus, defendants Buntzman, McGrath, Goldenberg, Flippin, Getter, Grunewald and Housman systematically failed to provide proper oversight at Interboro and accordingly face a substantial likelihood of liability for breach of fiduciary duties in connection with the improper

- 28 -

activities alleged herein. Accordingly, any demand upon these defendants or the remaining Director Defendants on the Board is futile;

(b)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the improper accounting. While in possession of this material adverse, non-public information regarding the Company, the following current members of the EVCI Board participated in the illegal insider selling:

(i)     During the Relevant Period, McGrath sold 150,000 shares of EVCI stock for proceeds of $1,725,000;

(ii)     During the Relevant Period, Buntzman sold 610,00 shares of EVCI stock for proceeds of $4,765,000.

(iii)     During the Relevant Period, Flippin sold 21,687 shares of EVCI stock for proceeds of $205,500.75.

(iv)     During the Relevant Period, Goldenberg sold 40,000 shares of EVCI stock for proceeds of $ 460,000; and

(v)     During the Relevant Period, Getter sold 7,250 shares of EVCI stock for proceeds of $95,486. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile;

(c)     The principal professional occupation of defendant Buntzman is his employment with EVCI, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically for FY:03 and FY:04, EVCI paid defendant Buntzman $465,996 and $666,686, respectively, in salary, bonus and other compensation, and granted him 140,719 and 20,281 options to purchase EVCI stock, respectively. For FY:05, Buntzman expects to receive an additional 360,000 options under EVCI's 2004 Plan. Accordingly, defendant Buntzman lacks independence from defendants Flippin, Grunewald and Housman,

- 29 -

defendants who are not disinterested and/or independent and who exert influence over defendant Buntzman's compensation by virtue of their position on the Compensation Committee. This lack of independence renders defendant Buntzman incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)     The principal professional occupation of defendant McGrath is his employment with EVCI, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically for FY:03 and FY:04, EVCI paid defendant McGrath $315,749 and $490,713, respectively, in salary, bonus and other compensation, and granted him 51,510 and 113,490 options to purchase EVCI stock, respectively. For FY:05, McGrath expects to receive an additional 240,000 options under EVCI's 2004 Plan. Accordingly, defendant McGrath lacks independence from defendants Flippin, Grunewald and Housman, defendants who are not disinterested and/or independent and who exert influence over defendant McGrath's compensation by virtue of their position on the Compensation Committee. This lack of independence renders defendant McGrath incapable of impartially considering a demand to commence and vigorously prosecute this action;

(e)     The principal professional occupation of defendant Goldenberg is his employment with Interboro, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Interboro is a wholly owned subsidiary of EVCI. Specifically for FY:03 and FY:04, EVCI paid defendant Goldenberg $200,546 and $195,053, respectively, in salary, bonus and other compensation, and granted him 19,604 and 45,396 options to purchase EVCI stock, respectively. Accordingly, defendant Goldenberg lacks independence from defendants Flippin, Grunewald and Housman, defendants who are not disinterested and/or independent and who exert influence over defendant Goldenberg's compensation by virtue of their positions on the Compensation Committee. This lack of independence renders defendant Goldenberg incapable of impartially considering a demand to commence and vigorously prosecute this action;

(f)     According to EVCI's Proxy Statement filed with the SEC on or about May 2, 2005, defendants Flippin, Getter and Housman were, during the Relevant Period, members of the

- 30 -

Audit Committee. The Audit Committee is responsible for reviewing "earnings press releases, as well as EVCI's policies with respect to earnings press releases, financial information and earnings guidance provided to analysts and rating agencies." Defendants Flippin, Getter and Housman failed to properly review EVCI's financial statements to correct any improper omissions of pertinent information. Therefore, defendants Flippin, Getter and Housman caused or allowed EVCI's financial statements to improperly omit the true status of Interboro's student enrollment. By such actions, defendants Flippin, Getter and Housman breached their duties by causing or allowing Interboro's inaccurate claims of student enrollment growth to increase EVCI's stated current and future income. As a result of these defendants' breach of their duties, any demand upon them is futile;

(g)     The entire EVCI Board and senior management participated in the wrongs complained of herein. EVCI's directors are not disinterested or independent due to the following: defendants Buntzman, McGrath, Goldenberg, Flippin, Getter, Grunewald and Housman served on the EVCI Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to EVCI and its shareholders in that they failed to prevent and correct the illegal activities and improper financials. Thus, the EVCI Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected EVCI to millions of dollars in liability for possible violations of applicable securities laws;

(h)     The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board, are subject to the following prejudicial entanglements of Buntzman and McGrath. Defendant Buntzman is the Chairman of the Board of EVCI and has been since its inception in 1997.

- 31 -

Defendant McGrath is President, CEO and director of EVCI. McGrath has been President and director since its inception. EVCI was founded by McGrath and Buntzman in March 1997. Prior to this, McGrath and Buntzman both were on the faculty of Mercy College from 1992 through 1995. Furthermore, from August 1995 to October 1996 Buntzman was the Chairman and CEO of Educational Televideo Communications, Inc. ("Televideo"). During the exact same period McGrath was President, director and principal stockholder of Televideo. Because of their personal and emotional ties, along with their long standing and entangling business and professional relationships, neither defendant Buntzman nor defendant McGrath will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(i)     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(j)     The Director Defendants of EVCI, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from EVCI's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(k)     In order to bring this suit, all of the directors of EVCI would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(l)     The acts complained of constitute violations of the fiduciary duties owed by EVCI's officers and directors and these acts are incapable of ratification;

(m)     Each of the Director Defendants of EVCI authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(n)     Any suit by the current directors of EVCI to remedy these wrongs would likely expose the Individual Defendants and EVCI to further violations of the securities laws that

would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(o)     EVCI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for EVCI any part of the damages EVCI suffered and will suffer thereby;

(p)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

(q)     If EVCI's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of EVCI. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by EVCI against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of EVCI, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there

- 33 -

is no directors' and officers' liability insurance at all then the current directors will not cause EVCI to sue them, since they will face a large uninsured liability.

81.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for EVCI for any of the wrongdoing alleged by plaintiff herein.

82.     Plaintiff has not made any demand on shareholders of EVCI to institute this action since such demand would be a futile and useless act for the following reasons:

        (a)     EVCI is a publicly held company with over 12 million shares outstanding, and thousands of shareholders;

        (b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

        (c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold EVCI common stock on the basis of such information.

85.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold EVCI common stock.

86.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of EVCI common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

- 34 -

87. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

88. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89. The Individual Defendants owed and owe EVCI fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe EVCI the highest obligation of good faith, fair dealing, loyalty and due care.

90. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

91. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, EVCI has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

93. Plaintiff on behalf of EVCI has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

94. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence EVCI, for which they are legally responsible.

- 35 -

96.     As a direct and proximate result of the Individual Defendants' abuse of control, EVCI has sustained significant damages.

97.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

98.     Plaintiff on behalf of EVCI has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of EVCI in a manner consistent with the operations of a publicly held corporation.

101.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, EVCI has sustained significant damages in excess of hundreds of millions of dollars.

102.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

103.    Plaintiff on behalf of EVCI has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused EVCI to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

106.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

107.    Plaintiff on behalf of EVCI has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of EVCI.

110.    Plaintiff, as a shareholder and representative of EVCI, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Directing EVCI to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect EVCI and its shareholders from a repeat of the damaging events that occurred during the Relevant Period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of EVCI to nominate at least three candidates for election to the Board;

3. appropriately test and then strengthen the internal audit and control functions; and

4. control and limit insider stock selling;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of EVCI has an effective remedy;

D. Awarding to EVCI restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 2, 2006

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON (TGA1515)

770 Lexington Avenue, 6th Floor
New York, NY 10021
Telephone: 212/935-6000
Facsimile: 212/935-6865

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

G:\Cases\EVCI\Complaints\Derivative\Ferre Cpt.doc

- 38 -

<u>VERIFICATION</u>

I, JEFFREY P. FINK, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, one of the counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 2nd day of March, 2006, at San Diego, California.

_____
JEFFREY P. FINK